UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATTY MCLAUGHLIN,

                              Plaintiff,

            -against-

STATE OF NEW YORK, STATE OFFICE
FOR PEOPLE WITH DEVELOPMENTAL
DISABILITIES (formerly known as the
OFFICE OF MENTAL RETARDATION
AND DEVELOPMENTAL
DISABILITIES), HUDSON VALLEY
DEVELOPMENTAL DISABILITIES
SERVICE OFFICES, and TIFFANY
COHEN, individually and in her official
capacity,

                              Defendants.

11 Civ. 1242 (SHS)


OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

Plaintiff Patty McLaughlin brings this action for race-based employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, against her former employer Hudson Valley Developmental Disabilities Service Offices ("DDSO"), the State Office for People with Developmental Disabilities, and the State of New York. McLaughlin also asserts claims pursuant to 42 U.S.C. § 1983 against her former supervisor, Developmental Aide Tiffany Cohen, in her official and individual capacities, for violating plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment.[1] Following discovery proceedings, defendants have now moved for summary judgment. (Dkt. No. 25.)

_____

[1] Plaintiff had asserted several additional claims in her complaint, but voluntarily withdrew them in February of this year. (Dkt. No. 30.)

Because no genuine issue of material fact exists with regard to the circumstances surrounding McLaughlin's employment, and defendants are entitled to judgment as a matter of law, their motion for summary judgment is granted.

## I.   BACKGROUND

Unless otherwise noted, the material facts set forth below are undisputed.

### A.   Plaintiff's Employment

Patty McLaughlin was hired by defendant DDSO as a Developmental Aide Trainee ("DAT") in January 2009. (Defs.' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' 56.1") ¶¶ 1, 5; Pl.'s Local Civil Rule 56.1 Response ("Pl.'s 56.1") ¶¶ 1, 5.) DDSO administers and oversees operations for defendant New York State Office for People with Developmental Disabilities, which coordinates services for thousands of New Yorkers with developmental disabilities and provides long-term care to disabled citizens in community settings. (Defs.' 56.1 ¶¶ 2-3; Pl.'s 56.1 ¶¶ 2-3.) These community settings, known as "individual residential alternatives," provide housing to individuals with physical, medical, and behavioral issues that necessitate twenty-four hour care. (Defs.' 56.1 ¶¶ 4, 13; Pl.'s 56.1 ¶¶ 4, 13.)

McLaughlin was assigned to work at one of the individual residential alternatives—the Riley Road residence—as a DAT. (Defs.' 56.1 ¶ 5; Pl.'s 56.1 ¶ 5.) Riley Road is an all-female facility housing twelve women. (Defs.' 56.1 ¶ 14; Pl.'s 56.1 ¶ 14.) In January 2009, when McLaughlin began her employment at Riley Road, the staff consisted of fifteen Developmental Aides ("DAs") and two DATs. (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 7.) The other DAT was Selena Williams, who started at the same time as McLaughlin. (Pl.'s Local Civil Rule 56.1 Counterstatement of Undisputed Facts ¶¶ 6-7 ("Pl.'s Counter 56.1"); Defs.' Local Civil Rule 56.1 Counterstatement of Undisputed Facts ¶¶ 6-7 ("Defs.' Counter 56.1").) The DAT position was a probationary one and conferred no tenure rights. (Defs.' 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.)

Tiffany Cohen, one of the DAs, was a supervisor at Riley Road. (Defs.' 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.) Cohen initially supervised both McLaughlin and Williams, who were assigned to the day shift. (Pl.'s Counter 56.1 ¶¶ 10-11; Defs.'s Counter 56.1 ¶¶ 10-11.) Cohen reported to DA William Powe. (Defs.' 56.1 ¶ 10; Pl.'s 56.1 ¶ 10.) Shari Bakst was the Treatment Team Leader responsible for the overall supervision of Riley Road and eight other community residences. (Defs.' 56.1 ¶¶ 11-12; Pl.'s 56.1 ¶¶ 11-12.) McLaughlin and Bakst are Caucasian; Williams and Cohen are African American. (Defs.' 56.1 ¶ 1; Pl.'s 56.1 ¶ 1; Decl. of Shari Bakst dated Feb. 20, 2013 ¶¶ 12, 32; Decl. of Patty McLaughlin dated March 21, 2012 ¶¶ 2, 6, 11.)

From her first week of employment, McLaughlin experienced problems at Riley Road. (Defs.' 56.1 ¶ 15; Pl.'s 56.1 ¶ 15.) She was the only white employee of approximately 14 persons assigned to the day shift. (McLaughlin Decl. ¶¶ 10, 36.) McLaughlin claims that she "was not uncomfortable with the racial makeup of Riley Road per se, but was made to feel uncomfortable by the way the black employees were treating her." (Pl.'s 56.1 ¶ 15.)

McLaughlin's issues at Riley Road primarily arose from her interactions with Cohen. Several incidents occurred shortly after McLaughlin started, on or around January 6, 2009. (McLaughlin Decl. ¶¶ 16, 20, 22-25.) Specifically, Cohen refused to sign the training book in which McLaughlin recorded her on-the-job training progress, then "flung" the book at McLaughlin. (Defs.' 56.1 ¶ 47; Pl.'s 56.1 ¶ 47.) Later that day, Cohen asked McLaughlin to comb an African American resident's hair without explaining the proper method. (McLaughlin Decl. ¶ 22.) After watching McLaughlin struggle, Cohen stepped in and demonstrated with a look of "disgust." (McLaughlin Decl. ¶ 23.) Then, when McLaughlin put on gloves before brushing the same resident's teeth—as she had learned to do in classroom training—Cohen reprimanded her for doing so. (McLaughlin Decl. ¶¶ 24-25; Defs.' 56.1 ¶ 47; Pl.'s 56.1 ¶ 47.)

Plaintiff asserts that, around the same time, an employee from Goshen Day Treatment Program named Joyce was at Riley Road and explained to plaintiff that "we're all African Americans here," that "we stick together"

and that Riley Road was "very cliquey." (Pl.'s Counter 56.1 ¶¶ 13-14; McLaughlin Decl. ¶ 28.) Defendants dispute this claim and allege that Goshen employee Joyce Mack has denied making the statement. (Defs.' Counter 56.1 ¶ 14.)

Additional confrontations took place between Cohen and McLaughlin over the next several weeks. A fire drill was held at Riley Road on or about January 13, and Cohen reprimanded McLaughlin for taking too long to vacate the building. (Defs.' 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.) Plaintiff admits she stopped to pick up a blanket, and in doing so, took longer than others, but claims that she did not know that what she did was contrary to protocol. (McLaughlin Decl. ¶ 34; Defs.' 56.1 ¶ 57; Pl.'s 56.1 ¶ 57.) Additionally, on January 17, plaintiff arrived at work and encountered Cohen and Williams in the kitchen, eating eggs. (Defs.' 56.1 ¶ 58; Pl.'s 56.1 ¶ 58.) Cohen refused to share her eggs with McLaughlin. (*Id.*) Instead, Cohen gave McLaughlin a look of "disgust" and left the room. (McLaughlin Decl. ¶ 38.) Williams offered McLaughlin some of her eggs, but McLaughlin did not take any. (Defs.' 56.1 ¶ 59; Pl.'s 56.1 ¶ 59.)

Plaintiff makes additional claims about Cohen. She asserts that Cohen permitted and encouraged McLaughlin's co-workers to ignore her and refuse to help her, but plaintiff neither observed Cohen doing so, nor was she told that Cohen had done so. (Defs.' 56.1 ¶¶ 48-50; Pl.'s 56.1 ¶¶ 48-50.) McLaughlin also asserts that Cohen failed to train her. The two examples she points to are the above-described grooming incident and an incident in which Cohen failed to instruct her on how to use a device designed to lift patients because that device was broken. (Defs.' 56.1 ¶¶ 51-54; Pl.'s 56.1 ¶¶ 51-54.) Finally, plaintiff asserts that Williams made mistakes during work, but was not disciplined as McLaughlin was, and was instead befriended and assisted by the other staff members. (McLaughlin Decl. ¶ 53; Pl.'s Opp. at 17-18.) Plaintiff concedes that neither Cohen nor any other Riley Road employee used any racial epithets or directed any racially derogatory comment toward McLaughlin at any point during her tenure at Riley Road. (Defs.' 56.1 ¶¶ 46-47; Pl.'s 56.1 ¶¶ 46-47.)

Cohen and her supervisor Powe met with McLaughlin approximately three weeks into her employment to discuss the issues McLaughlin was

having at Riley Road. (Defs.' 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.) The meeting was tense from the outset. (Stmt. of William Powe dated Feb. 3, 2009, Ex. B. to Bakst Decl.) Plaintiff began by explaining that she was "not a racist," but that she was upset by the situation Joyce had allegedly explained to her—that the African American staff members "all stick together." (Powe Stmt., Ex. B to Bakst Decl.; Defs.' 56.1 ¶¶ 17-18; Pl.'s 56.1 ¶¶ 17-18.) Plaintiff then complained that the staff was "very cliquish." (*Id.*) Two days later, on January 24, Williams complained to the overall supervisor of Riley Road, Baskt, that McLaughlin had talked to others in the house about Williams's scores on qualifying tests and about the fact that Williams did not have a driver's license. (Defs.' 56.1 ¶ 19; Pl.'s 56.1 ¶ 19; *see also* McLaughlin Decl. ¶ 46.) Baskt then asked McLaughlin to refrain from gossiping. (Defs.' 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.)

On approximately January 27, less than one month after she started working for DDSO, plaintiff was sent to Goshen Day Treatment Program, purportedly to diffuse some of the tension that had been developing at Riley Road. (Defs.' 56.1 ¶ 21; Pl.'s 56.1 ¶ 21; Email from Shari Bakst dated January 30, 2009, Ex. C to Bakst Decl.) Nonetheless, McLaughlin appeared "very upset" when she arrived at Goshen Day facility and complained to the Goshen supervisor that the employees at Riley Road were "racist." (Defs.' 56.1 ¶ 21; Pl.'s 56.1 ¶ 21.) Bakst had also been receiving reports that McLaughlin complained about Cohen to her co-workers constantly. (Bakst Decl. ¶ 19; Bakst Email, Ex. C to Bakst Decl.) Bakst and Powe met with McLaughlin on January 30 to discuss her issues with the Riley Road staff. (Defs.' 56.1 ¶¶ 25-27; McLaughlin Decl. ¶ 50.) McLaughlin claims that at this meeting, she was accused of "making disruptive racist remarks about the staff of the house, gossiping about the other employees, and complaining of not having enough work to do." (McLaughlin Decl. ¶ 51.) Plaintiff explained that, although she had no problem working with anyone of any race, she did not fit in at the house—which employed primarily persons who were "young," "black," and "cliquish"—because she is white. (Defs.' 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.)

The day after that meeting Bakst met with plaintiff again after hearing from Cohen that plaintiff was gossiping. (Defs.' 56.1 ¶¶ 36-39; Pl.'s 56.1 ¶¶ 36-39.) McLaughlin denies doing any more than repeating a rumor she had

heard from a third party to Bakst herself. (Defs.' 56.1 ¶ 38; Pl.'s 56.1 ¶ 38.) Nevertheless, Bakst again counseled plaintiff to stop passing along gossip, explaining that it was causing problems between McLaughlin and other staff members. (Defs.' 56.1 ¶ 39; Pl.'s 56.1 ¶ 39.)

In early February, McLaughlin was transferred to the evening shift, which meant that Cohen was no longer plaintiff's direct supervisor.[2] (McLaughlin Decl. ¶ 62.) McLaughlin's experience improved after this change. (*Id.*) Nevertheless, on February 2, Bakst received reports of plaintiff commenting that the staff liked Williams better than McLaughlin because Williams is black. (Defs.' 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.) One week later, Powe informed Bakst that staff members had seen McLaughlin bring a recording device to work for the purpose of gathering information about Riley Road employees.[3] (Defs.' 56.1 ¶ 43; Pl.'s 56.1 ¶ 43; Email from William Powe dated Feb. 11, 2009, Ex. H to Bakst Decl.)

On February 17, 2009—approximately six weeks after plaintiff began work as a probationary DAT—Bakst requested that McLaughlin be terminated. (Defs.' 56.1 ¶ 44; Pl.'s 56.1 ¶ 44.) Bakst claims the request was based on two primary considerations: Riley Road employees on both the day and evening shifts had been trying to limit contact with McLaughlin because of her behavior, and McLaughlin's constant gossiping about her fellow employees continued to be a problem. (Bakst Decl. ¶ 13.) On the same day, McLaughlin made a formal complaint of racial discrimination with DDSO's affirmative action officer. (Defs.' 56.1 ¶ 63; Pl.'s 56.1 ¶ 63.) The termination request was reviewed by the director of human resources and approved by the director of DDSO, both of whom are Caucasian. (Defs.' 56.1 ¶ 45; Pl.'s 56.1 ¶ 45; Bakst Decl. ¶ 14.) Cohen was not consulted about and took no part in the decision to fire McLaughlin. (Defs.' 56.1 ¶¶ 66-67; Pl.'s 56.1 ¶¶ 66-67.) On February 18, DDSO notified plaintiff in writing that her employment was terminated, effective February 27, 2009.

---

[2] The record is unclear as to the race of plaintiff's new evening-shift supervisor, Jerry Haney. (*See* McLaughlin Decl. ¶¶ 19, 62.)

[3] The Court describes the reports made to Bakst solely for the uncontested facts that she received such complaints about plaintiff. The Court does not consider the truth vel non of the underlying allegations.

(Defs.' 56.1 ¶ 64; Pl.'s 56.1 ¶ 64; Ltr. to Patty McLaughlin dated February 18, 2009, Ex. J to Bakst Decl.) A few months later, in July 2009, Williams was also terminated, as a result of timeliness and attendance issues. (Bakst Decl. ¶ 12.)

### B.   Procedural History

Plaintiff filed a complaint with the New York State Division of Human Rights ("SDHR") in April 2009, claiming she was subject to disparate treatment because of race in violation of Title VII. (SDHR Compl. dated April 7, 2009, Ex. C to Decl. of Jason Buskin, Esq. dated Feb. 21, 2013.) McLaughlin authorized SDHR to accept the complaint on behalf of the U.S. Equal Employment Opportunity Commission ("EEOC"). (*Id.*) Six months later, SDHR found no probable cause to support plaintiff's allegations. (SDHR Closing Stmt. dated October 25, 2010, Ex. F to Buskin Decl.)

On February 23, 2011, plaintiff filed this action.

## II.   ANALYSIS

Based on the foregoing facts, plaintiff brings claims pursuant to Title VII and section 1983. First, she claims that she was unlawfully discriminated against because of her race by her employer in violation of Title VII. She also appears to claim, for the first time on summary judgment, that her employer violated Title VII by retaliating against her. Finally, she alleges that Cohen's actions violated McLaughlin's equal protection rights. The undisputed facts support the entry of judgment in favor of defendants.

### A.   Summary Judgment Standard

A grant of summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the district court must grant summary judgment in favor of the opposing party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Brown v.*

*Dep't of Educ.*, No. 10 Civ. 5023 (SHS), 2012 WL 1319859, at *4 (S.D.N.Y. April 11, 2012). In undertaking this inquiry, the Court "resolv[es] all ambiguities and draw[s] all inferences in favor of the non-moving party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). "Nonetheless, the party opposing summary judgment 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence' in support of its factual assertions." *Self v. Dep't of Educ.*, 844 F. Supp. 2d 428, 434 (S.D.N.Y. 2012) (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998)).

### B.   Plaintiff Has Not Satisfied Her Prima Facie Title VII Burden

To establish a prima facie case of racial discrimination pursuant to Title VII, a plaintiff must demonstrate: "1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). The plaintiff's burden at this stage is minimal, but she must "proffer[] admissible evidence [that] would be sufficient to permit a rational finder of fact to infer a [discriminatory] motive." *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If the plaintiff makes such a showing, the burden then shifts to her employer to provide a legitimate, nondiscriminatory explanation for its conduct. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant meets this burden, the plaintiff must provide evidence that would allow a rational factfinder to determine that the defendant's proffered rationale is a pretext for unlawful discrimination. *Alston v. Microsoft Corp.*, 851 F. Supp. 725, 731 (S.D.N.Y. 2012).

Here, plaintiff has failed to make a prima facie case. The Court assumes for the purpose of argument that McLaughlin is a member of a protected class and was qualified for her position. It finds that she suffered an adverse employment action. Plaintiff has not, however, produced sufficient evidence to allow a rational finder of fact to infer that her employer's actions were racially motivated and therefore has not fulfilled her initial burden of proof.

### 1.   *Alleged Adverse Employment Actions*

Prior to determining whether the alleged adverse employment actions that plaintiff suffered occurred under circumstances giving rise to an inference of racial discrimination, the Court must determine what those adverse employment actions are.

An adverse employment action is "a materially adverse change in the terms and conditions of employment." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (internal quotations and citation omitted). It must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry*, 336 F.3d 138 (internal quotations and citation omitted). "[M]aterially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (internal quotations, alterations, and citation omitted). In addition, "harms suffered in the workplace are cognizable under Title VII, even when they are not the result of tangible employment actions, if they arise from conduct (1) that is objectively severe or pervasive—that is, if it creates an environment that a reasonable person would find hostile or abusive, . . . (2) that the plaintiff subjectively perceives as hostile or abusive, . . . and (3) that creates such an environment because of . . . [a] characteristic protected by Title VII . . . ." *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001) (internal quotations, alterations, and citations omitted). "Isolated instances of harassment ordinarily do not rise to this level." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).

In her complaint, plaintiff alleges that the adverse employment actions she suffered were termination and discrimination based on her race during the course of a training program.[4]  On summary judgment,

---

[4] Plaintiff also conclusorily alleges that she was subject to employment practices that had a disparate impact upon her because of her race. (Compl. ¶ 83.) Because she has nowhere pointed to "a facially neutral employment policy or practice [that had] a significant disparate impact," this claim decidedly fails. *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998).

however, she argues that she was also subjected to a hostile work environment.

Based on the record, the Court concludes that the only adverse employment action McLaughlin has demonstrated is her termination. The conduct that she now attempts to frame as creating a hostile work environment—principally Cohen's disciplining of McLaughlin and her various unfriendly or rude acts toward McLaughlin—is not objectively severe or pervasive enough to meet that test. It appears that a personality conflict existed between Cohen and McLaughlin. Cohen may have disliked McLaughlin; she may have been uncivil or even unkind to McLaughlin. But it is well-established that Title VII "does not set forth a general civility code for the American workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations and citation omitted). "[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language," simply do not create an actionable hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (internal quotations and citation omitted). The conduct McLaughlin points to here amounts to nothing more than a rather quotidian workplace conflict. It therefore does not constitute a materially adverse change in the conditions of her employment.

### 2. The Circumstances of Plaintiff's Termination Do Not Give Rise to an Inference of Discrimination

Assuming that plaintiff is a member of a protected class and that she was qualified for her position, and finding that she suffered an adverse employment action—her termination—the Court turns to the final element of her prima facie case: whether a rational factfinder could conclude her termination occurred under circumstances giving rise to an inference of discrimination. The answer is no.

A plaintiff may raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."*Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). To proceed under a disparate treatment theory, "plaintiff must show she was similarly situated in all material respects to the individuals with whom she

seeks to compare herself." *Id.* (internal quotations and citation omitted). Plaintiff must "show that similarly situated employees who went undisciplined engaged in comparable conduct." *Id.* The conduct need not be identical, but it should be of "comparable seriousness." *Id.* (citation omitted).

McLaughlin relies upon this theory here; she concedes that nobody at Riley Road ever expressly demonstrated racial animus toward her. (Pl.'s Opp. at 17.) Instead, she claims that Selena Williams was a similarly situated employee of a different race who was treated more favorably than McLaughlin.

McLaughlin and Williams were not sufficiently similarly situated, however, that their divergent treatment suggests hidden racial animus. *See Shumway v. United Parcel Serv., Inc.*, 118 F. 3d 60, 64-65 (2d Cir. 1997). Although Williams and McLaughlin had the same position, the same supervisor, and started on the same day, salient differences exist. The record demonstrates that McLaughlin's behavior at work led to her termination; and there is no indication whatsoever that Williams's conduct was similar. Specifically, McLaughlin was counseled a number of times about the fact she had been impermissibly gossiping about other employees, and she clearly had a contentious relationship with her supervisor, Tiffany Cohen. Although McLaughlin denies that she ever gossiped or spread rumors, the record demonstrates that she often complained about her supervisor and coworkers to her fellow employees. (*See, e.g.*, Defs.' 56.1 ¶ 19; Pl.'s 56.1 ¶ 19; Bakst Decl. ¶ 19; Bakst Email, Ex. C to Bakst Decl.; McLaughlin Decl. ¶¶ 18, 27, 32.) The record further shows that McLaughlin's complaints about race created tension in an intimate working environment designed to serve a vulnerable population. There is no evidence that Williams engaged in any behavior that was analogous or that created any tension. As such, the two are not similarly situated to the extent that would permit an inference that any difference in their treatment was the product of racial discrimination.

Moreover, Williams was not treated markedly differently than McLaughlin with regard to the *material* conditions of her employment—as opposed to day-to-day interactions with other employees. Although the

record indicates that the Riley Road staff was friendlier to and more accepting of Williams, Williams was fired only a few months after McLaughlin.  Williams's termination was based on her timeliness and attendance issues, whereas McLaughlin's termination was based on her inability to work with other staff members. Nevertheless, the two DATs' conduct was of comparable seriousness to the extent that it hampered their effectiveness at work and their ability to care for the residents of Riley Road. McLaughlin spent her time complaining and was easily upset, whereas Williams was simply not present. And both DATs were disciplined in the same way: they were fired.

Finally, the Court notes that, although Cohen—the source of many of McLaughlin's complaints—is African American, Shari Bakst and her supervisors, who were responsible for the decision to fire McLaughlin, are white.  The parties agree that Cohen was not consulted about, and took no part in, the decision to fire McLaughlin.  This fact further undercuts McLaughlin's claim that she was terminated based on her race.

This is not to say that race was a complete non-issue at Riley Road. Although McLaughlin insists that her initial concerns about the racial makeup of the Riley Road staff stemmed from another staff member's isolated comment about the fact that the majority of the employees were African American and "cliquey," it is McLaughlin herself who repeatedly accused others of racism and constantly complained about being treated poorly because she is white. There is no evidence—apart from McLaughlin's speculation about the motivation behind others' behavior— that this was the case or that anyone else at Riley Road had a problem with the racial composition of the staff.

Because no rational factfinder could infer a racially discriminatory motive based on the circumstances of McLaughlin's firing, she has not met her prima facie burden. Therefore, defendants' motion for summary judgment is granted with regard to plaintiff's racial discrimination claim.

### C. Even If Plaintiff Had Properly Raised a Retaliation Claim, It Fails

Plaintiff contends for the first time on summary judgment that she was subjected to retaliation for her protected activity in violation of Title VII. Defendants correctly point out that McLaughlin did not raise this claim in administrative proceedings before the SDHR or in her complaint and never sought to amend her complaint to add this cause of action. As such, defendants were not put on notice that plaintiff intended to raise a claim of retaliation, and this claim is not properly before the Court.

Even if plaintiff had properly raised a retaliation claim, however, defendants have provided evidence of a legitimate, nondiscriminatory explanation for her firing. As the Supreme Court recently explained, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). The evidence presented here demonstrates that plaintiff's behavior was causing problems—and that defendants had addressed these problems on multiple occasions—prior to her engaging in any protected activity. As such, no rational trier of fact could find that plaintiff's firing was "because" of her complaint to the equal employment officer, rather than the misbehavior that had inspired several disciplinary meetings. *See id.*

### D. Plaintiff Has Not Demonstrated That Her Equal Protection Rights Were Violated

McLaughlin additionally contends, pursuant to 42 U.S.C. § 1983, that Cohen violated McLaughlin's rights under the Equal Protection Clause of the U.S. Constitution. The Fourteenth Amendment protects individuals from discrimination in public employment. *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 117-18 (2d Cir. 2004). To support a section 1983 claim for recovery for a violation of this right, a plaintiff must prove that she suffered purposeful discrimination at the hands of a state actor based on a protected characteristic. *Id.*

McLaughlin alleges that Cohen's treatment of her violated McLaughlin's equal protection rights. The inquiry as to whether Cohen's

conduct was discriminatory is the same as the Title VII inquiry. *See Back*, 365 F.3d at 123. For the reasons explained above, Cohen's behavior did not rise to the level of actionable discrimination.  Accordingly, plaintiff's section 1983 claim fails as well.

### III. CONCLUSION

For the foregoing reasons, summary judgment is granted in favor of defendants. The Clerk of Court is directed to enter judgment dismissing the complaint with prejudice.

Dated:  New York, New York
      July 30, 2013

SO ORDERED:

Sidney H. Stein, U.S.D.J.

14